James M. LOVE, Northwest Food Processors Association, a non-profit association, and Tualatin Valley Fruit Marketing, Inc., an Oregon corporation, Plaintiffs,

v.

Lee M. THOMAS, Administrator Environmental Protection Agency, Defendant.

Civ. No. 87–343–RE.

United States District Court, D. Oregon.

May 21, 1987.

Susan K. Eggum, McEwen, Gisvold, Rankin & Stewart, Phillip D. Chadsey, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., Portland, Or., John A. Amodeo, U.S. Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendant.

## OPINION

REDDEN, District Judge:

Plaintiffs James M. Love, an Oregon farmer and packer, the Northwest Food Processors Association (NWFPA), a non-profit trade association of seventy fruit, vegetable and potato growers and processors in Oregon, Washington and Idaho, and Tualatin Valley Fruit Marketing, Inc. (TVFM), an Oregon corporation which grows and processes berry crops, move for a preliminary injunction under Fed.R.Civ.P. 65(a). They seek relief from an order of the Environmental Protection Agency (EPA) suspending the distribution, sale, or use of pesticides containing dinoseb (2–sec-butyl–5, 6 dinitrophenol). They request a court order allowing the application of dinoseb to green pea, snap bean, cucurbit (cucumbers, squash and zucchini) and caneberry crops in the states of Oregon, Washington and Idaho.

The defendant is Lee M. Thomas, Administrator of the EPA.

The EPA issued the suspension order based on evidence that dinoseb may unreasonably endanger applicators of this pesticide by causing birth defects, lowered male reproductive capability and possibly, death. The issue is whether that decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with procedures established by law. Plaintiffs claim the EPA did not properly weigh the risks as opposed to the benefits of the use of dinoseb, in that there are no alternative pesticides which can be used in the northwest.

This case was filed late Friday, April 3, 1987. The defendant was allowed until April 9, 1987 to brief its position. Trial commenced April 13 and concluded on April 14, 1987. An injunction and an expedited opinion were entered on April 15, 1987. That opinion promised a more thorough opinion to follow. This opinion incorporates much of the April 15 opinion, but adds sections on jurisdiction and the scope of review.

## STATUTORY FRAMEWORK

The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136, et seq., generally requires all pesticides to be registered for use with the EPA Administrator. However, the pesticide must meet the registration requirements set forth in 7 U.S.C. § 136a(c)(5), including a determination that it will not cause "unreasonable adverse effects on the environment." A continuous review of registered pesticides is required, to incorporate new information to protect human health and the environment. 7 U.S.C. § 136d.

In the event of new information that a registered pesticide poses a significant threat to human health or the environment, the Administrator may cancel the registration of that pesticide. 7 U.S.C. § 136d(b)(1). Depending on the severity of the hazard, the Administrator may (1) cancel the registration; (2) suspend the registration pending cancellation (ordinary suspension); or (3) suspend the registration immediately (emergency suspension). These three choices are necessary because of the varied risks of a pesticide depending on its nature and use, and the amount of time consumed by cancellation or suspension proceedings during which a dangerous pesticide would otherwise continue to be used.

This case involves the third type of action, the emergency suspension.

*Ordinary Suspensions and Expedited Hearings*

If the Administrator determines a pesticide presents an imminent hazard, its registration may be suspended during the time required for cancellation. First, however, the Administrator must notify the registrant, or manufacturer, of the pesticide before issuing a suspension order. 7 U.S.C. § 136d(c)(1). The purpose of this notice is to provide for an expedited hearing, if the registrant requests it, on the question of whether an imminent hazard exists. *Id.* The order is effective after the expedited hearing, if one is requested. If no hearing is requested, the order is effective immediately. It is not reviewable by a court. 7 U.S.C. § 136d(c)(2). Five days are allowed after notice is received to request a hearing. After the passage of five days, the EPA may issue the order of suspension. *Id.*

A finding of imminent hazard results from a determination that the risks appear to outweigh the benefits of use of a pesticide during the cancellation proceedings. *Dow Chemical Co. v. Blum*, 469 F.Supp. 892, 898–899 (E.D.Mich.1979).

*Emergency Suspension*

There is one exception to the requirement of notice to registrants before suspension of a pesticide registration. Whenever the Administrator determines an emergency is of such magnitude as to preclude an expedited hearing before suspension, he may issue a suspension order before he notifies the registrants. 7 U.S.C. § 136d(c)(3). The emergency suspension order is effective immediately. Notice to registrants is still required, and they may request an expedited hearing within five days after notice is received.

*Participants in the Expedited Hearing*

An ordinary suspension order requires notification of the registrant. 7 U.S.C. § 136d(c)(1). Only the registrant may request an expedited hearing. The only matter for consideration at the hearing is whether an imminent hazard exists. The expedited hearing must commence within five days after a registrant requests one, unless otherwise agreed. No one other than registrants may participate in this expedited hearing.

If an emergency suspension order is issued, the registrants must request an expedited hearing within five days after they receive notice of the suspension. Any person adversely effected by the emergency suspension may file briefs with the EPA. Anyone who files a brief is a party, and may obtain judicial review.

*Judicial Review*

7 U.S.C. § 136d(c)(4) provides that "a final order on the question of suspension following a hearing shall be reviewable in accordance with section 136n of this title ..." 7 U.S.C. § 136n provides for review by a Court of Appeals.

However, if an emergency suspension is ordered before an expedited hearing, that order is subject to immediate review in a district court. Either the registrant or another interested person who has the concurrence of the registrant may bring this action. The only question for the court is whether the order of suspension was arbitrary, capricious or an abuse of discretion, or whether the order was issued in accordance with the procedures established by law. 7 U.S.C. § 136d(c)(4). Judicial review and administrative review of the suspension order may proceed simultaneously. *Id.*

*FACTS*

On October 7, 1986 the EPA issued an emergency suspension order pursuant to 7 U.S.C. § 136d(c)(3), without prior notice to registrants. The order prevented any further sale, distribution or use of pesticide products containing dinoseb. The required post-order notification to registrants was published in the Federal Register on October 14, 1986. 51 Fed.Reg. 36,634.

Four registrants requested an expedited hearing as provided for in 7 U.S.C. § 136d(c)(2) and (3). The hearing convened on October 20, 1986. Ten days later on October 30, 1986 all four registrants withdrew their requests for an expedited hearing and it was terminated. The EPA entered an immediate final suspension order as provided in 7 U.S.C. § 136d(c)(2) and (3).

On November 26, 1986 the administrative law judge closed the docket in the expedited hearing.

Plaintiff Northwest Food Processors Association (NWFPA) petitioned the EPA for a subpart D hearing on February 11, 1987 to reconsider and modify the suspension order as provided for in 40 C.F.R. 164.130–133.[1] NWFPA contended dinoseb was the only truly efficacious pesticide for green peas, snap beans, caneberries and cucurbits, which was used successfully in the northwest for forty years. They claimed they would incur significant crop and financial losses if the order prohibiting dinoseb was not modified.

On April 1, 1987 the EPA denied the request to reconsider its order with respect to green peas and snap beans on the grounds that the petitioner had not "presented substantial new evidence which may materially affect the prior suspension order." 52 Fed.Reg. 11,119 (April 7, 1987). With such a determination, the EPA is not required to hold a hearing. 40 C.F.R. § 164.131(b). Such a decision is final. By April 15, 1987, the day the hearings ended in federal court, the EPA apparently had still not acted on the petition with respect to caneberries and cucurbits.

Earlier, however, the EPA had allowed modification of the order to permit the use of dinoseb under strictly monitored conditions to dry peas, lentils, and chick peas. On January 20, 1987 the American Dry Pea and Lentil Association petitioned the EPA for a Subpart D hearing on this issue. In mid-February, the EPA agreed to hold a hearing. The hearing concluded concluded on March 10, 1987 and the administrative law judge who presided recommended a modification of the suspension order to allow application of dinoseb on these crops. On March 30, 1987 the EPA approved the administrative law judge's recommendation.

Following the EPA's denial of the petition to modify the suspension order, plain-tiffs filed on April 3, 1987 for a preliminary injunction in federal court. The EPA filed a motion to dismiss this action for lack of jurisdiction under Fed.R.Civ.P. 12(b)(1). The EPA also filed a motion in limine to restrict this court's review to the administrative record, in the event the court finds it has jurisdiction. Both motions were denied.

## DISCUSSION

### Jurisdiction

The EPA contends plaintiffs erroneously base jurisdiction on section 10(a) of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706; the "federal question" provision of 28 U.S.C. § 1331; and on FIFRA, 7 U.S.C. §§ 136d(c)(4) and 136n(c).

▌ I find that FIFRA provides this court with jurisdiction to review the EPA's emergency suspension order. 7 U.S.C. § 136d(c)(4) provides for judicial review. It states in relevant part:

A final order on the question of suspension following a hearing shall be reviewable in accordance with section 136n of this title, notwithstanding the fact that any related cancellation proceedings have not been completed.... Any order of suspension entered prior to a hearing before the Administrator shall be subject to immediate review in an action by the registrant or other interested person with the concurrence of the registrant in an appropriate district court, solely to determine whether the order of suspension was arbitrary, capricious or an abuse of discretion, or whether the order was issued in accordance with the procedures established by law.

The EPA argues that the facts of this case should be viewed as if there were no requests for a hearing, since it ended prematurely upon the withdrawal of the registrants' requests for a hearing. If I find no requests occurred, the EPA contends 7 U.S.C. § 136d(c)(2) precludes court review. § 136d(c)(2) states in relevant part:

1. 40 C.F.R. §§ 164.130–133 allows interested parties to petition the EPA for a hearing after cancellation or suspension of a pesticide on whether the order should be reconsidered and modified. The petitioner must present substan-tial new evidence which would materially affect the order, which could not have been discovered with due diligence prior to the issuance of the final order.

If no request for a hearing is submitted to the Agency within five days of the registrant's receipt of the notification provided for by paragraph (1), the suspension order may be issued and shall take effect and shall not be reviewable by a court.

The EPA also cites *Dow Chemical v. Blum,* 469 F.Supp. 892, 899 (E.D.Mich.) for this proposition.

I decline to view the facts as if there were no requests for an expedited hearing. Factually such a conclusion is inaccurate insofar as four registrants requested a hearing. Nothing in the record indicates why these requests were withdrawn ten days into the hearing, to justify a conclusion that no hearing took place. These registrants were concerned enough initially to attempt to challenge the finding that dinoseb presents an imminent hazard. Second, *Dow Chemical v. Blum* only cites § 136d(c)(2); it does not hold that an emergency suspension order cannot be reviewed by a court when a final order is entered after a partial expedited hearing terminates. Finally, I decline to foreclose the plaintiffs here from pursuing their rights as persons adversely affected by the order, as provided in 7 U.S.C. § 136d(c)(3). The record will reflect plaintiffs' contention that they were unaware of their right to file briefs, because their rights were not spelled out in the Federal Register notice of October 14, 1986. 51 Fed.Reg. 36,364 at 36,648. They are not entitled to letter notice from the EPA, as are the registrants, which heightens the need to notify them of their rights in the Federal Register. 40 C.F.R. § 164.120(a) and (b).

Alternatively, the EPA argues this court has no jurisdiction if it finds a hearing was held. In that case, it claims the emergency suspension order can be regarded as "a final order on the question of suspension following a hearing" which is reviewable exclusively in the Court of Appeals under § 136n. 7 U.S.C. § 136d(c)(4). Thus, the EPA would view the hearing as if it had been completed. However, both the statute and the legislative history make it apparent that Congress provided for review by the Court of Appeals following a hearing because the court would have a whole record to determine whether there was substantial evidence to support the order of the Administrator. *Environmental Defense Fund v. Costle,* 631 F.2d 922, 931–32 (D.C.Cir.1980). I cannot conclude that the record from a ten day hearing was "whole" enough so that review could proceed as Congress intended. Further, these plaintiffs were foreclosed from obtaining judicial review in the Court of Appeals under § 136n because they had no notice of a right to file briefs, which is a requirement to become parties for purposes of appellate review under § 136n. Consequently, it is not equitable to proceed as if a hearing was held.

I find this court has jurisdiction to review the emergency suspension order under 7 U.S.C. § 136d(c)(4). I specifically find an expedited hearing was requested, but was terminated prior to its conclusion, and therefore, the order of suspension was entered prior to a hearing. These plaintiffs were entitled to participate in that hearing by filing briefs, but were not notified of their right to do so.

The EPA argues that because § 136d(c)(4) provides for "immediate review," plaintiffs are foreclosed because they waited six months to pursue their right to judicial review. However, I find inadequate notice precluded plaintiffs from pursuing their rights in a more timely fashion, and that while Congress intended to ensure judicial review immediately following an emergency suspension order, it did not intend by that language to foreclose later review if merited. In fact, § 136d(c)(4) states that judicial review may be maintained simultaneously with any administrative review proceeding, which can take months. Plaintiffs filed this case immediately after the EPA notified them that their request for a modification was rejected.

Because I find FIFRA provides me with jurisdiction to review the emergency suspension order, I do not reach the issue of whether jurisdiction also exists under the APA or the "federal question" provision of 28 U.S.C. § 1331.

Pursuant to 7 U.S.C. § 136d(c)(4), I must decide whether the emergency suspension order banning dinoseb was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the procedures established by the law.

*Scope of Review*

■ Under the arbitrary and capricious standard, I must determine whether the EPA considered all relevant factors and whether it made a clear error of judgment. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The inquiry made into the facts must be searching and careful, particularly in a highly technical case. The standard of review is narrow, however, in that this court cannot substitute its judgment for that of the EPA. *Id.* at 416, 91 S.Ct. at 823. Despite the substantial latitude a court must give the EPA upon a review of its actions, especially where judgment and uncertainty are invoked with respect to an emergency suspension order, there are limits on the exercise of EPA emergency powers. The EPA's conclusions must be held to minimal standards of rationality. *Dow Chemical v. Blum*, 469 F.Supp. 892, 902–03 (E.D.Mich.1979).

Court review of agency action is normally based on the full administrative record before the Administrator at the time he made his decision. *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825. The EPA moved accordingly to restrict my review to the administrative record. That motion was denied. I determined that it was necessary to go outside the record to evaluate the EPA's actions properly, given the emergency nature of the situation before me, the highly technical nature of the subject matter, and potential deficiencies in the administrative record given the haste with which it was assembled to respond to the hearing on a preliminary injunction. Further, plaintiffs presented evidence that the EPA's fact-finding procedures were not adequate, and that the EPA subsequently had modified its order banning dinoseb with respect to some crops in the northwest during the process of administrative review. Therefore, oral and other evidence not in the administrative record was necessary for me to evaluate whether the EPA took into consideration all relevant factors. It was impossible to make such a determination without going outside the record to determine what matters the agency should have considered but did not, and to discharge my duty to make a "substantial inquiry," rather than taking the EPA's word that it considered all relevant matters. *Asarco, Inc. v. U.S.E.P.A.*, 616 F.2d 1153, 1159–60 (9th Cir.1980). In considering the evidence presented outside the administrative record, I did not question the scientific merit of the EPA's decision. All the evidence substantiating the risks of use of dinoseb appeared to be well-founded. Instead, I was concerned that the EPA had not considered all relevant factors, including a proper weighing of the benefits of dinoseb use, as opposed to the risks as required by 7 U.S.C. § 136(bb).

*The Relevant Factors*

After correctly determining the risks of the use of dinoseb, the EPA was then required to determine whether the benefits of use outweighed the risks. The EPA also must determine whether an emergency exists. To make this determination the EPA must determine whether there is a substantial likelihood that serious harm will be experienced during the three or four months required to complete the administrative suspension process.

It is necessary for the EPA to examine five factors in this process:

"(1) The seriousness of the threatened harm;

(2) The immediacy of the threatened harm;

(3) The probability that the threatened harm would result;

(4) Benefits to the public of the continued use of the pesticide in question during the suspension process; and

(5) The nature and extent of the information before the Administrator at the time he made his decision." *Dow Chemical v. Blum*, 469 F.Supp. at 902.

■ I find that the EPA did not consider all relevant factors and, hence, made a clear error of judgment resulting in my

finding that their entry of the emergency suspension order was arbitrary and capricious. In making this determination, I relied extensively on the only case interpreting FIFRA's emergency suspension provisions, even though the issues are different. The reasoning in that case, *Dow Chemical v. Blum*, 469 F.Supp. 892 (1979), is sound. It provides a comprehensive framework in which to evaluate EPA actions with respect to emergency orders.

I specifically find the EPA did not consider the immediacy of the threatened harm, the benefits to the public of continued use of dinoseb during the suspension process, and the nature and extent of the information it had collected in order to determine if dinoseb should be banned immediately.

In the fall of 1986, the EPA concluded that there was immediate threatened harm in the northwest from applications of dinoseb. However, no dinoseb was to be used on northwest crops until late March or April of 1987, where it is used as a pre-emergent spray. The bulk of dinoseb is not used in the northwest, but is used in the fall in other areas of the country. The heaviest use of dinoseb is on potato and peanut crops, and this use was the EPA's major concern. The potato crop had already been treated by the time the EPA issued its emergency suspension order on October 14, 1986. Thus one area of most concern to the EPA in terms of immediate harm was not affected by its order. The agency did have the power to suspend registration on a crop by crop and/or area by area basis. Instead, they chose to approach the problem on a national level.

Because of the way in which the EPA gathered information, the impact of a ban on dinoseb on the northwest was treated in a cursory, unacceptable fashion. The key EPA witness testified at the hearing on April 14, 1987 that in gathering information with respect to the potential ban of dinoseb, the risks and benefits of its use on approximately fifteen sites had to be evaluated. The EPA branch responsible for

evaluating the benefits was given only one month in which to prepare its analysis. To analyze the benefits, the EPA began with the largest crops using the greatest percentage of dinoseb. Unfortunately, due to budget constraints creating lack of staff and other resources, and the tight time schedule, the EPA stopped evaluating the benefits when it was at about the sixth or seventh site out of the total of fifteen sites.[2] What data it did use in analyzing dinoseb sites in the northwest was scanty, and inconsistent with or contradicted by data readily available to, but not considered by, the EPA.

In particular, the EPA did not determine the efficacy of alternative pesticides it proposed to substitute for dinoseb in the northwest. Consequently, the estimated financial impact to the northwest could not be determined accurately in weighing risks versus benefits. In considering alternative herbicides, the EPA referred to labels of various commercially produced chemicals and cited those claimed to be effective in dessicating specific weeds. EPA was aware of the fact that black nightshade, a prevalent and particularly harmful weed in the northwest, could be treated effectively only with dinoseb, but was not fully aware of the extent of the problem to assess adequately its devastating effect on the crops and economy of the area. Further, one chemical cited as an alternative could not be legally used on the crops the EPA proposed, because it is not registered for such use.

One of the economic benefit studies prepared for the decision-makers, and relied upon, was a Summary of Biological and Economic Impacts of a Suspension/Cancellation for Dinoseb, dated September 2, 1986. Defendant's Exhibit 120. This document analyzed the economic benefits for the period of September 1986 to March of 1987. It was derived from a similar document prepared in May of 1986, which states it is "limited in scope and should not be considered as a benefit analysis." De-

2. The notice of October 14, 1986 states: "For some other sites, such as green peas, snap beans, caneberries, and hops, the extent of economic impacts is uncertain."

51 Fed.Reg. 36,656. These are major crops in the Pacific Northwest.

fendant's Exhibit 12, p. 1. The September document was not updated.

As a consequence of the lack of information gathered with respect to the northwest, the EPA's estimates of the economic harm nationally in dollar amount is but a small percentage of the actual economic harm to be inflicted on the northwest alone. The plaintiffs who grow crops claim a daily loss of $171,000 since April 1, 1987, and potential financial crop losses of $39.2 million this year. This estimate does not include the financial losses which the food processors will incur.

In determining whether to issue an emergency suspension order, the EPA must assess whether an "imminent hazard" exists. When notice is published of the order, the Administrator must include his findings on the question of whether an imminent hazard exists. 7 U.S.C. § 136d(c)(1). The term "imminent hazard" is defined to mean "a situation which exists when the continued use of a pesticide during the time required for cancellation proceedings would be likely to result in unreasonable adverse effects on the environment ..." 7 U.S.C. § 136(l). The term "unreasonable adverse effects on the environment" is defined to mean "unreasonable risk to man or the environment *taking into account* the economic, social and environmental costs and *benefits*." 7 U.S.C. § 136(bb). *Dow Chemical Co. v. Blum*, 469 F.Supp. at 898, 899 (Emphasis added). The EPA was required by law to take into account the benefits of the use of dinoseb as part of its procedure in determining whether an emergency suspension order was necessary. Because they neglected to gather essential and available data to determine the benefits on a national level, instead of just the sites involving the heaviest use of dinoseb, they did not follow the procedures required by 7 U.S.C. § 136(bb). Therefore, I find that the order of October 14, 1986 was not in accordance with the procedures established by law.

I do not hold that in such emergency actions the EPA must conduct a full scale and timely investigation or conduct complex studies or investigations to complete their balancing act, but I do hold that more than the perfunctory inquiry made here must be shown.

The final relevant factor the EPA had to consider in making its decision to ban dinoseb was the nature and extent of the information it had collected at the time the decision was made. In finding the Administrator's decision arbitrary and capricious, I have already noted the evaluation of benefits required by law was suspended because of lack of staff, time, and money. Further, the record shows that telephone calls were made to knowledgeable people in the northwest, but no record of what was discovered by those calls was made.

A minimal investigation would have revealed that the alternative sprays proposed were not viable alternatives in the northwest, although they were viable in other areas of the country where soil and other conditions differ. Defendant had no rebuttal to the conclusions of experts who testified that no viable alternative chemical sprays exist presently. This fact means massive crop failures and buyer rejection of northwest crops. It is significant that the growers have contracted to raise these crops and the processors have contracted to process and sell them.

It is also significant that when the EPA obtained more information in hearings held in March, 1987, it modified the order to allow the application of dinoseb to dry peas and lentils. There is no reasonable explanation why the crops at issue are treated differently. The application of dinoseb is frequently done by the same individuals and the risks affecting them are the same no matter what crops are being treated. One witness testified that he raises both dry and green peas. He had just sprayed his dry peas with dinoseb, but could not legally spray his adjoining green pea crop. Had the nature and extent of information been different before the Administrator at the time he made his decision, this arbitrary treatment could have been avoided.

*Preliminary Injunction*

To obtain a preliminary injunction, plaintiff must show either: (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of

serious questions going to the merits and the balance of hardships tipping in its favor. *Oakland Tribune, Inc. v. Chronicle Pub. Co.,* 762 F.2d 1374, 1376 (9th Cir. 1985); *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200–01 (9th Cir.1980). These are not separate tests, but are at the ends of the continuum; the greater the relative hardship to the moving party, the less probability of success must be shown. *National Center for Immigration Rights, Inc. v. INS,* 743 F.2d 1365, 1369 (9th Cir. 1984). Under any formulation of the test, plaintiff must demonstrate that there exists a significant threat of irreparable injury. *Oakland Tribune,* 762 F.2d at 1376.

■ I find the plaintiffs will likely succeed on the merits or at the very least there are serious questions going to the merits and that the balance of hardships tips in plaintiffs' favor.

My reasoning on the merits phase has been set forth. Briefly, plaintiffs have sustained their burden of proof by proving that the actions of EPA were arbitrary and capricious because of the failures and omissions noted earlier in this Opinion.

I also find irreparable harm. Plaintiffs' proof demonstrated that if the EPA's emergency suspension order is not enjoined, northwest agriculture will suffer crop losses conservatively estimated at $39.2 million. Losses are estimated at $171,000 per day during the spring planting season when dinoseb applications are prohibited. Those daily costs have occurred since April 1, 1987.

It is well established that monetary injuries due to lost income do not constitute irreparable harm. *Los Angeles Memorial Coliseum v. NFL,* 634 F.2d at 1202; *Regents of University of California v. ABC,* 747 F.2d 511 (9th Cir.1984). However, I find other adverse effects will cause irreparable harm to the northwest. Crop losses of this magnitude will result in business failures not only for farmers, but for the food processing industry as well. Their estimated losses are not included in the $39.2 million estimated loss for growers. David Pahl, President of the Northwest

Food Processors Association, testified that many of the 32 food processing companies in that association who process dinoseb-dependent crops generate 30 or more percent of their total sales volume from those crops. If dinoseb applications are not allowed at this time, these companies will lose their competitive edge in the market due to increased costs of production. Further, buyers who purchased dinoseb-dependent food products in the northwest will no longer purchase other food products from these processors because they will no longer be drawn to markets in the northwest.

In addition, several processing plants are the principal payroll in small Washington and Oregon communities, including Stayton, Woodburn and Milton-Freewater in Oregon and Mt. Vernon, Ferndale, Chehalis and Lynden in Washington. If these processing plants cease to operate because of business losses, community stability will be profoundly and adversely affected. The State of Oregon anticipates and proved a potential and severe impact on its economy if these losses disrupt the agricultural industry to the extent predicted.

Accordingly, I find that to the extent the public interest is a factor in balancing injury, irreparable harm will result if I do not grant the plaintiffs' motion for a preliminary injunction.

## SUMMARY

After a review of the administrative record, other evidence in the form of affidavits and oral testimony and the law as it applies to this case I have concluded that plaintiffs should prevail. Accordingly I have entered an appropriate injunction.

In addition to this ruling I have denied defendant's motion to dismiss for lack of jurisdiction and defendant's motion in limine to restrict review to the administrative record.

I have declined to rule on plaintiffs' contention that I have jurisdiction pursuant to 28 U.S.C. § 1331 or § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702.